1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  OCCUPY SACRAMENTO, et al.,         No. 2:11-cv-02873-MCE-GGH

12          Plaintiffs,

13      v.                             <u>MEMORANDUM AND ORDER</u>

14  CITY OF SACRAMENTO, et al.,

15          Defendants.

16                         ----oo0oo----

17

18      Before the Court is Plaintiffs' Amended Motion for Temporary

19  Restraining Order [ECF No. 10].  For the reasons that follow, the

20  Motion is DENIED.

21

22                          **BACKGROUND**

23

24      Plaintiffs are participants in a local movement known as

25  "Occupy Sacramento," which is loosely affiliated with the ongoing

26  "Occupy Wall Street" demonstrations.  The "Occupy" demonstrators

27  have been protesting, among other things, social and economic

28  inequality issues for the past several months.

1

Starting on Thursday, October 6, 2011, and continuing to the present, the "Occupy Sacramento" participants have congregated in Cesar Chavez Plaza Park ("the Park"), which is a community park, approximately 2.5 acres in size, in downtown Sacramento and located across the street from City Hall.  On October 6, when the Occupy Sacramento participants began to gather and set up structures in the Park, representatives of the Sacramento Police Department advised the demonstrators that the Park would close at 11:00 p.m. pursuant to Sacramento City Code § 12.72.090.  That ordinance, which was enacted in its current form in 1981, states, in full:

**12.72.090 Remaining or loitering in parks during certain hours prohibited.**

A.   No person shall remain or loiter in any public park:

    1.   Between the hours of midnight Friday or Saturday and five a.m. of the following day; and

    2.   Between the hours of eleven p.m. Sunday through Thursday and five a.m. of the following day.

B.   The prohibitions contained in subsections (A)(1) and (A)(2) of this section shall not apply:

    1.   To any person on an emergency errand;

    2.   To any person attending a meeting, entertainment event, recreation activity, dance or similar activity in such park provided such activity is sponsored or co-sponsored by the department of parks and community services or a permit therefor has been issued by the department of parks and community services;

    3.   To any person exiting such park immediately after the conclusion of any activity set forth in subsection (B)(2) of this section;

4.   To any peace officer or employee of the city
     while engaged in the performance of his or
     her duties.

C.   The director, with the concurrence of the chief of
     police, may designate extended park hours for any
     park when the director determines that such
     extension of hours is consistent with sound use of
     park resources, will enhance recreational
     activities in the city, and will not be
     detrimental to the public safety or welfare.  The
     prohibitions contained in subsections (A)(1) and
     (A)(2) of this section shall not apply to any
     person present in a public park during extended
     park hours designated pursuant to this subsection.

D.   The chief of police, with the concurrence of the
     director of parks and community services, may
     order any park closed between sunset and sunrise
     when he or she determines that activities
     constituting a threat to public safety or welfare
     have occurred or are occurring in the park and
     that such closing is necessary to protect the
     public safety or welfare.  At least one sign
     designating the sunset to sunrise closing shall be
     installed prominently in the park.  When a park is
     ordered closed between sunset and sunrise, it is
     unlawful for any person to remain or loiter in
     said park during said period.  (Prior code §
     27.04.070).

Later on October 6, attorney Mark E. Merin ("Merin"), the

attorney for the Plaintiffs in the present action, sought a

temporary restraining order ("TRO") in Sacramento County's

Superior Court.  See Exh. B to Decl. of Brett M. Witter attached

to Defendants' Opposition ("Witter Decl.").  Although not brought

on behalf of the specific Plaintiffs in this action, the ex parte

Request for TRO sought to restrain and prevent Sacramento's Chief

of Police from enforcing § 12.72.090 and from citing or arresting

persons remaining in the Park after hours.  The Request averred

that unsuccessful attempts had been made to contact both the

Chief of Police and the City Manager to request an extension or a

permit granting the extension.

3

1    At 8:30 p.m. on October 6, Sacramento County Superior Court

2  Judge Lloyd Connelly heard oral argument on the Request from

3  Merin and Supervising Deputy City Attorney Brett Witter.   See

4  Exh. C to Witter Decl.   On Friday, October 7, Judge Connelly

5  issued an Order denying the Request for TRO.   Id.

6    In his Order, Judge Connelly concluded that the Petitioner

7  had (1) "failed to establish that it would suffer irreparable

8  harm if the temporary restraining order was not issued, as the

9  demonstration could be held during normal park hours;" and (2)

10  "not reasonably attempted to apply for a permit to use the park

11  for camping purposes, as Petitioner made no attempt to request

12  such a permit until at least 3:30 p.m. on October 6, 2011."   Id.

13    Plaintiffs contend that the City's Police Department has not

14  permitted demonstrators to remain or loiter in the Park after the

15  hours set forth in § 12.72.090.   Plaintiffs assert that every

16  night before closing, they must pack up their property and move

17  out of the park or face arrest.   They allege that over 50 people

18  have been arrested and taken into custody since October 6 for

19  violating § 12.72.090.

20    Plaintiffs do not allege that they attempted to obtain a

21  permit or an extension of the park hours from Sacramento's

22  Director of the Department of Parks and Recreation ("Director"),

23  as set forth in § 12.72.090(C), prior to filing this action.

24  However, on Thursday, October 24, Merin did send a letter to the

25  City Manager, the City Attorney and the City Council (hereinafter

26  "Oct. 24 Merin Letter").   See Exh. 1 to First Amended Complaint.

27  ///

28  ///

4

In essence, Merin's letter stated that (1) the City's enforcement
of § 12.72.090 violated the demonstrators' First Amendment
rights; (2) he was prepared to file a lawsuit to validate those
rights; and (3) he encouraged these various officials to permit
the demonstrators to remain in the Park.  Id.

On Wednesday, November 1, Merin filed the instant action,
including both the Complaint and the Motion for TRO.  In both the
Complaint and the Motion for TRO, Plaintiffs' generally allege
that § 12.72.090 is unconstitutional on its face and as applied
to them and that Defendants have violated Plaintiffs' First and
Fourteenth Amendment rights by enforcing § 12.72.090.[1]  The
Complaint seeks a TRO, a preliminary injunction, and a permanent
injunction.  Presently before the Court is Plaintiffs' Motion for
a TRO.  On November 2, Defendants filed their Opposition, and
Plaintiffs filed their Reply.

The Court held a hearing on Plaintiffs' Motion for TRO on
Thursday, November 3.  Of note, at the hearing, counsel for the
parties advised the Court that, earlier in the day, Plaintiffs
filed an application for an overnight use permit for the Park
with the Department of Parks and Recreation and that the Director
had promised to review the application on an expedited basis.
Although the ordinary turnaround time for such an application is
apparently ten days, the Director promised a decision by Monday,
November 7.  Despite the pending application, both parties
declined to dismiss or delay the Court's decision as to the
pending Motion for TRO.

---

[1] Plaintiffs amended their complaint and Motion for TRO on
November 2.

5

1  After hearing oral argument on the issues, the Court issued
2  a verbal Order denying the Motion, but also promised a written
3  Order would follow.  At the hearing, the Court also established a
4  briefing schedule and hearing date for Plaintiffs' Complaint.

5

6                               **STANDARD**

7

8  The purpose of a temporary restraining order is to preserve
9  the status quo pending the complete briefing and thorough
10 consideration contemplated by full proceedings pursuant to a
11 preliminary injunction.  See Granny Goose Foods, Inc. v.
12 Teamsters, 415 U.S. 423, 438-39 (1974) (temporary restraining
13 orders "should be restricted to serving their underlying purpose
14 of preserving the status quo and preventing irreparable harm just
15 so long as is necessary to hold a hearing, and no longer"); see
16 also Reno Air Racing Ass'n., Inc. v. McCord, 452 F.3d 1126, 1131
17 (9th Cir. 2006); Dunn v. Cate, 2010 WL 1558562 at *1 (E.D. Cal.
18 2010).

19 Issuance of a temporary restraining order, as a form of
20 preliminary injunctive relief, is an extraordinary remedy, and
21 Plaintiffs have the burden of proving the propriety of such a
22 remedy.  See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).  In
23 general, the showing required for a temporary restraining order
24 and a preliminary injunction are the same.  Stuhlbarg Int'l Sales
25 Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7
26 (9th Cir. 2001).

27 ///

28 ///

1   The party requesting preliminary injunctive relief must show
2   that "he is likely to succeed on the merits, that he is likely to
3   suffer irreparable harm in the absence of preliminary relief,
4   that the balance of equities tips in his favor, and that an
5   injunction is in the public interest." Winter v. Natural
6   Resources Defense Council, 555 U.S. 7, 20 (2008); Stormans, Inc.
7   v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting same).
8   The propriety of a TRO hinges on a significant threat of
9   irreparable injury that must be imminent in nature. Caribbean
10   Marine Serv. Co. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).
11       Alternatively, under the so-called sliding scale approach,
12   as long as the Plaintiffs demonstrate the requisite likelihood of
13   irreparable harm and show that an injunction is in the public
14   interest, a preliminary injunction can still issue so long as
15   serious questions going to the merits are raised and the balance
16   of hardships tips sharply in Plaintiffs' favor. Alliance for
17   Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-36 (9th Cir. 2011)
18   (concluding that the "serious questions" version of the sliding
19   scale test for preliminary injunctions remains viable after
20   Winter).

21
22                            **ANALYSIS**
23   **A.    Procedural TRO Issues**
24         **1.    Undue Delay**
25
26   Before turning to the merits of Plaintiffs' Motion for TRO,
27   the Court finds that denial of their Motion is warranted here on
28   procedural grounds alone.

7

1   Plaintiffs bear the burden of showing that, among other things,

2   they are likely to suffer irreparable injury and the injury must

3   be imminent in nature.  Caribbean Marine, 844 F.2d at 674.  Local

4   Rule 231(b) which governs the timing of motions for TROs, states,

5   in full:

6           In considering a motion for a temporary restraining
            order, the Court will consider whether the applicant
7           could have sought relief by motion for preliminary
            injunction at an earlier date without the necessity for
8           seeking last-minute relief by motion for temporary
            restraining order.  Should the Court find that the
9           applicant unduly delayed in seeking injunctive relief,
            the Court may conclude that the delay constitutes
10          laches or contradicts the applicant's allegations of
            irreparable injury and may deny the motion solely on
11          either ground.

12          Plaintiffs' contention is that a TRO is necessary because

13  every night their First Amendment rights are being violated when

14  the Police enforce the allegedly unconstitutional regulation, §

15  12.72.090.  Although the Superior Court denied a similar request

16  for TRO filed by Merin on October 7, Merin did not file the

17  instant action in this Court until November 1, some twenty-five

18  days after Judge Connelly's Order.  In the interim, Plaintiffs

19  allege that approximately fifty people have been arrested for

20  violations of § 12.72.090.  Plaintiffs could have sought a

21  preliminary injunction, without resorting to the extraordinary

22  form of relief that is a TRO, in the interim period between

23  October 7 and November 1.

24          Furthermore, Plaintiffs have not demonstrated to this

25  Court's satisfaction that they were pursuing their rights before

26  State or City officials in the interim between Judge Connelly's

27  Order and their filing the present action.

28  ///

8

In their brief, they do not aver that they pursued an appeal from Judge Connelly's denial of their TRO and they did not file an application with the Director for a permit to extend the Park hours, despite Judge Connelly's statement that Merin's failure to do so was a basis for denying the Request for TRO.  The only evidence of action by Plaintiffs to prevent the City from enforcing § 12.72.090 prior to filing this action is the Oct. 24 Merin Letter, in which he requested the City officials stop enforcing the ordinance.  That letter, however, was not directed to the Director and it does not appear to be seeking a permit to extend the Park hours.  Furthermore, the Court was not persuaded by counsel's explanation of his activities during the time between Judge Connelly's order and the filing of this action, which he provided at oral argument on November 3.

The twenty-five day lapse between Judge Connelly's Order and the filing of this action, coupled with the number of arrests for violations of the ordinance, and Plaintiffs' apparent failure to diligently  pursue other forms of relief, tends to undermine their claim that the extraordinary remedy of a TRO is warranted. Stated another way, the Court is of the view that the twenty-five day delay between Judge Connelly's Order and the filing of this action contradicts Plaintiffs' claims of irreparable injury if the TRO does not issue and that under the circumstances here, twenty-five days constitutes undue delay.  See L.R. 231(b); Caribbean Marine, 844 F.2d at 674.

///

///

///

1

2

### 2.   **Status Quo**

The second preliminary concern for the Court relates to the purpose of a TRO.  Specifically, a TRO's purpose is to preserve the status quo pending complete briefing by the parties and full proceedings.  See Dunn, 2010 WL 1558562 at *1.  Here, the status quo is that § 12.72.090 has been in effect since 1981 and since October 6, the day that Occupy Sacramento started to congregate in the Park, the City, through its Police Department, has indicated its intention to enforce the ordinance and has actively enforced it by arresting demonstrators who have refused to comply with § 12.72.090's terms.  In sum, the status quo is that there is currently a thirty-year old ordinance which is being enforced by the government.

So, Plaintiffs' Motion for TRO does not seek to maintain the status quo, rather it seeks to alter the status quo: if granted, the City would be precluded from enforcing § 12.72.090.  Contrary to the terms of the ordinance and present practice, Plaintiffs would then be able to maintain an around-the-clock presence in the Park.  This would be a material change of position from the status quo.

The situation here is therefore significantly different from the one faced by "Occupation" demonstrators in some other cities where the demonstrators have recently sought to obtain a TRO.  For example, in Nashville, Tennessee, officials allegedly enacted a policy after demonstrators began gathering in a public space that established a curfew and permit regulations on public land.  There, a federal district court granted Plaintiffs a TRO.

10

A similar situation appears to be unfolding in Trenton, New
Jersey, where officials established rules prohibiting visitors to
a memorial from bringing certain property onto the public land
<u>after</u> the demonstrators began congregating.  Although it is not
yet known whether the court will grant the TRO, the Nashville and
Trenton cases are instructive because in both those cases, the
status quo was allegedly altered by the officials' enactment of
new rules following the arrival of the "Occupy" protestors on
public land.

In contrast, here, § 12.72.090 predates the Occupy
Sacramento demonstrations by thirty years, there is no allegation
that the City was not enforcing it prior to October 6, when
Plaintiffs began congregating in the Park, and there is evidence
that the City has been consistently enforcing the ordinance since
the demonstrations started.  Therefore, maintaining the status
quo here, means continuing to enforce § 12.72.090.

Plaintiffs, however, assert that the status quo is their
constitutional right to free speech and free association and that
the status quo is violated when the City enforces § 12.72.090,
which they contend is facially unconstitutional because it
violates their First Amendment rights.  The Court finds this
argument circular and unpersuasive, as it assumes the truth of
the matter at issue.  Specifically, this argument assumes that
§ 12.72.090 is unconstitutional, therefore every time the
ordinance is enforced, Plaintiffs' established rights are
violated.  Even if the Court were to accept this logic, the
problem is that it has not been established at this time that §
12.72.090 is unconstitutional.

11

1   As will be discussed further below, the fact that an
2   ordinance stifles speech or expression does not necessarily lead
3   to the conclusion that it is unconstitutional: courts have
4   frequently upheld such ordinances, so the mere fact that the
5   City's enforcement of § 12.72.090 does not necessarily lead to
6   the conclusion that the ordinance is unconstitutional.
7   Therefore, the Court cannot conclude that each time the City
8   enforces § 12.72.090, the status quo is disturbed and a TRO is
9   justified.

10   In sum, the Court is also not persuaded that the purpose of
11   Plaintiffs' Motion is to maintain the status quo, which is the
12   underlying purpose of a TRO.  See Dunn, 2010 WL 1558562 at *1.
13   However, the Court is loathe to deny Plaintiffs' Motion solely on
14   procedural grounds, so the Court also considers the substance of
15   Plaintiffs' Motion.

16

17   **B.   Substantive TRO Issues**

18

19   Although Plaintiffs contend in their Complaint that
20   § 12.72.090 is unconstitutional both on its face and as applied,
21   at oral argument they conceded that, at this stage of the
22   litigation, they are relying solely on their facial challenge.[2]
23   Again, to succeed on their Motion for a TRO, Plaintiffs must
24   establish that: (1) they are likely to succeed on the merits;

25

26   [2] Plaintiffs concede that they do not have evidence to
27   support an as-applied challenge at the present time, but suggest
     that discovery may uncover evidence to support this claim.
28   Because Plaintiffs do not pursue this claim at the present time,
     the Court does not address it here.

1    (2) they are likely to suffer irreparable harm absent preliminary

2    relief; (3) the balance of equities tips in their favor; and

3    (4) an injunction is in the public interest.  <u>Winter</u>, 555 U.S. at

4    20.  Or, in the alternative, they must satisfy the sliding scale

5    standard set forth in <u>Cottrell</u>.  632 F.3d at 1131-36.

6        Here, the Court concludes that Plaintiffs have failed to

7    meet their burden under either the <u>Winter</u> or <u>Cottrell</u> standard.

8    Plaintiffs have not met their burden of showing a likelihood that

9    they will succeed on the merits because § 12.72.090: appears to:

10   (1) be content neutral, (2) be narrowly-tailored, (3) support a

11   substantial government purpose; (4) provide the Director with

12   constitutionally sufficient discretion; and (5) be

13   constitutionally sufficient even though the City may be able to

14   exempt itself from the permitting regulations.  Furthermore,

15   Plaintiffs have not met their burden of showing irreparable har

16   or showing that the balance of equities or public interest

17   necessitate the extraordinary remedy of a TRO.

18

19        **1.   Success on the Merits**

20

21        As a general matter, a facial challenge is a challenge to an

22   entire legislative enactment or provision.  <u>Foti v. City of Menlo</u>

23   <u>Park</u>, 146 F.3d 629, 635 (9th Cir. 1998)(explaining that a statute

24   is facially unconstitutional if "it is unconstitutional in every

25   conceivable application, or it seeks to prohibit such a broad

26   range of protected conduct that it is unconstitutionally

27   overbroad").

28   ///

13

1  "[T]he Supreme Court has entertained facial freedom-of-expression

2  challenges only against statutes that, 'by their terms,' sought

3  to regulate 'spoken words,' or patently 'expressive or

4  communicative conduct' such as picketing or handbilling."

5  Roulette v. City of Seattle, 97 F.3d 300, 303 (9th Cir. 1996)

6  (upholding an ordinance passed by Seattle that prohibited people

7  from sitting or lying on public sidewalks in certain commercial

8  areas between 7:00 a.m. and 9:00 p.m., finding that neither

9  activity "is integral to, or commonly associated with,

10 expression").  Id. at 303-304 (citation omitted).

11     The government may impose content-neutral time place and

12 manner restrictions on speech, provided that they are narrowly

13 tailored to advance a significant governmental interest, and

14 leave open ample, alternative avenues of communication.  Thomas

15 v. Chicago Park Dist., 534 U.S. 316, 323 n.3 (2002); Clark v.

16 Community for Creative Non-Violence, 468 U.S. 288, 293 (1984).

17 The level of scrutiny depends on whether the challenged ordinance

18 is "related to the suppression of free expression."  Texas v.

19 Johnson, 491 U.S. 397, 403 (1989) (internal quotation marks and

20 citation omitted).  "If a law hits speech because it aimed at it,

21 then courts apply strict scrutiny; but if it hits speech without

22 having aimed at it, then courts apply the O'Brien intermediate

23 scrutiny standard."  Nordyke v. King, 644 F.3d 776, 792 (9th Cir.

24 2011) (citing United States v. O'Brien, 391 U.S. 367, 377 (1968).

25 ///

26 ///

27 ///

28 ///

14

1    Plaintiffs do not concede that § 12.72.090 is content-
2    neutral, but even if it is, they contend that § 12.72.090 cannot
3    survive intermediate scrutiny because it is not narrowly
4    tailored; is over-broad and under-inclusive; does not advance a
5    significant governmental interest; it provides no meaningful
6    limits on the Director's discretion; and because it exempts the
7    City from the permitting requirements, which could lead to
8    viewpoint discrimination.

9    Plaintiffs have not persuaded the Court that they are likely
10   to succeed in their facial challenge.  Section 12.72.090 appears
11   to be a narrowly-tailored and content-neutral time, place and
12   manner restriction that applies to <u>anyone</u> who wishes to use the
13   park during certain hours.

14   First, Plaintiffs have not met their burden of demonstrating
15   that § 12.72.090 is not content-neutral.  On its face,
16   § 12.72.090 appears to be content neutral: it does not make any
17   reference to speech and it merely regulates the hours that <u>anyone</u>
18   can remain or loiter in City parks.  While § 12.72.090 does have
19   the direct effect of limiting speech and expressive activities in
20   City parks during those hours during which people are not
21   permitted to remain or loiter in the parks, "reasonable time,
22   place, or manner regulations normally have the purpose and direct
23   effect of limiting expression but are nevertheless valid."
24   <u>Clark</u>, 468 U.S. at 294 (citation omitted).  Plaintiffs have not
25   alleged any content-based purpose behind § 12.72.090 and it is
26   unlikely that they will be able to do so.

27   ///
28   ///

15

1   Second, Plaintiffs have not presented any compelling
2   evidence that § 12.72.090 is not narrowly-tailored.  A regulation
3   of speech or speech-related conduct is overbroad–and therefore
4   facially invalid–if it punishes a substantial amount of protected
5   speech, judged in relation to the regulation's plainly legitimate
6   sweep.  Virginia v. Hicks, 539 U.S. 113 (2003).  The regulation
7   must be narrowly tailored to advance a government's legitimate,
8   content-neutral interest, but need not be the least restrictive
9   or least intrusive means of doing so.  Ward v. Rock Against
10  Racism, 491 U.S. 781, 798 (1989).  Plaintiffs argument that
11  § 12.72.090 is either over-broad or under-inclusive is not
12  compelling.

13      The ordinance is limited to City parks and limited to five
14  or six hours a day between the hours of 11:00 p.m. and 5:00 a.m.
15  Section 12.72.090 does not prevent Plaintiffs from conducting
16  their expressive activities twenty-four hours a day on adjoining
17  sidewalks or in other public spaces if they so choose.  It just
18  prevents them from doing so by remaining or loitering in City
19  parks after the hours established by the ordinance if they do not
20  have a permit to do so.  It is therefore not over-broad.  Neither
21  is it under-inclusive.  The fact that § 12.72.090 applies to
22  parks and not to sidewalks or other public places does not lead
23  inevitably to the conclusion that the hours restrictions are
24  intended to stifle free expression in City parks, as Plaintiffs
25  suggest.
26  ///
27  ///
28  ///

1    Third, § 12.72.090 appears to support a substantial
2  government interest.  In his declaration, the Director asserted
3  the following government interests for this ordinance: (1) the
4  general public's enjoyment of park facilities; (2) the viability
5  and maintenance of those facilities; (3) the public's health,
6  safety and welfare; and (4) the protection of the City's parks
7  and public property from overuse and unsanitary conditions.
8  These interests appear to be narrowly-tailored and substantial
9  and similar to the interests the Supreme Court found
10  constitutionally sufficient in Clark.  See 468 U.S. at 296.

11    The Court finds the Supreme Court's reasoning in Clark to be
12  particularly informative.  In Clark, at issue were regulations
13  that stated that camping in National Parks is permitted only in
14  campgrounds designated for that purpose.  Id. at 289-92.  The
15  plaintiffs wanted to camp in Lafayette Park (which is located in
16  Washington, D.C., across the street from the White House) and on
17  the National Mall to demonstrate in support of the plight of the
18  homeless, however neither of these public parks were designated
19  campgrounds under the regulations at issue.  Id. at 291-92.
20  Plaintiffs argued, among other things, that the regulations
21  violated the First Amendment.  Id. at 293.

22    The Supreme Court, however, found that the regulations were
23  content-neutral time, place or manner restrictions.  Id. at 295.
24  The Court agreed that the tents and the act of sleeping out could
25  all be expressive activity and that the regulation at issue
26  prohibited those activities in Lafayette Park or on the Mall,
27  nonetheless, the Court noted that:
28  ///

17

It is also apparent to us that the regulation narrowly focuses on the Government's substantial interest in maintaining the parks in the heart of our Capital in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence.  To permit camping—using these areas as living accommodations—would be totally inimical to these purposes, as would be readily understood by those who have frequented the National Parks across the country and observed the unfortunate consequences of the activities of those who refuse to confine their camping to designated areas.

Id. at 296.  The Court also noted that if it were to find the regulation was invalid on First Amendment grounds, "there would be other groups who would demand permission to deliver an asserted message by camping in Lafayette Park" and that this "would present difficult problems for the Park Service."  Id.

Although camping is not directly at issue in this case, the Court finds the City's interests at issue here are substantially similar to the government interests that were found to be constitutionally sufficient in Clark.[3]

///

///

_____

[3] A similar result was obtained in Vietnam Veterans Against The War/Winter Soldier Organization v. Morton, 506 F.2d 53 (D.C. Cir. 1974).  In that case, the appellees sought to enjoin the "Superintendent of the National Capital Parks and his superiors from withholding from them a permit to establish a 'symbolic campsite' on the Mall" on freedom of expression grounds  Id. at 54.  The D.C. Circuit, however, rejected this argument, noting that the demonstrators were given a permit on the Mall that allowed them to "propound their views by assembling, speaking, pamphleteering, parading, carrying banners, and erecting whatever structures they deem necessary to effective communication of their message."  The only restriction was a ban on camping, which, the court noted meant that the protestors "are only prohibited from cooking and camping overnight, activities whose unfettered exercise is not crucial to the survival of democracy and which are thus beyond the pale of First Amendment protection."  Id. at 57-58.

18

1   Therefore, the Court is not persuaded that Plaintiffs are likely
2   to be able to succeed on the merits of their argument that there
3   is no substantial government interest behind § 12.72.090.

4        Fourth, the Court is not persuaded that Plaintiffs are
5   likely to succeed on the merits of their argument that
6   § 12.72.090 is unconstitutional because it fails to provide
7   "meaningful limits" on the discretion of the Director to
8   determine when to extend Park hours.  "Where the licensing
9   official enjoys unduly broad discretion in determining whether to
10  grant or deny a permit, there is a risk that he will favor or
11  disfavor speech based on its content."  Thomas, 534 U.S. at 323
12  (citing Forsyth County v. Nationalist Movement, 505 U.S. 123, 131
13  (1992)).  The Supreme Court has therefore "required that a time,
14  place, and manner regulation contain adequate standards to guide
15  the official's decision and render it subject to effective
16  judicial review."  Id.

17       In Thomas, the Supreme Court addressed the issue of whether
18  Chicago Park District officials had unduly broad discretion in
19  determining whether to grant or deny a permit to use a municipal
20  park.  534 U.S. at 317-18.  Under the challenged city ordinance,
21  the Park District was given discretionary authority to deny a
22  permit on any of thirteen specified grounds.  Id. at 318-20.  For
23  example, the Park District could deny a permit if the use or
24  activity "would present an unreasonable danger to the health or
25  safety of the applicant, or other users of the park, of Park
26  District Employees or of the public."  Id. at 319 n.1.
27  ///
28  ///

1    The petitioners contended that the criteria set forth in the

2    ordinance were insufficiently precise because they gave the Park

3    District discretionary authority to deny applications rather than

4    specific grounds on which the application must be denied.  Id. at

5    324.  The Supreme Court, however, concluded that the  Park

6    District's discretion was not over-broad and upheld the

7    ordinance, noting that:

8           Granting waivers to favored speakers (or, more
            precisely, denying them to disfavored speakers) would
9           of course be unconstitutional, but we think that this
            abuse must be dealt with if and when a pattern of
10          unlawful favoritism appears, rather than by insisting
            upon a degree of rigidity that is found in few legal
11          arrangements.  On petitioners' theory, every obscenity
            law, or every law placing limits upon political
12          expenditures, contains a constitutional flaw, since it
            merely permits, but does not require, prosecution.  The
13          prophylaxis achieved by insisting upon a rigid,
            no-waiver application of the ordinance requirements
14          would be far outweighed, we think, by the accompanying
            senseless prohibition of speech (and of other activity
15          in the park) by organizations that fail to meet the
            technical requirements of the ordinance but for one
16          reason or another pose no risk of the evils that those
            requirements are designed to avoid.  On balance, we
17          think the permissive nature of the ordinance furthers,
            rather than constricts, free speech.

18

19   Id. at 325.

20        Here, § 12.72.090(C) grants the Director discretionary

21   authority, with the concurrence of the Chief of Police, to extend

22   park hours, subject to three conditions.  Specifically, it

23   permits the Director to extend park hours when the Director

24   determines that (1) such extension of hours is consistent with

25   sound use of park resources, (2) the extension will enhance

26   recreational activities in the city, and (3) the extension will

27   not be detrimental to the public safety or welfare.

28   ///

                                    20

1  Neither the Director's discretionary authority, nor the three
2  criteria at issue in § 12.72.090(C), appear to be materially
3  different from the type of criteria that the Supreme Court upheld
4  in Thomas.

5      Furthermore, Plaintiffs have not demonstrated that there is
6  no meaningful opportunity for judicial review of licensing
7  decisions.  Plaintiffs have not presented any evidence that
8  judicial review is unavailable and Defendants have provided the
9  Court with the park use permitting process outlined in
10  §§ 12.72.160-180 (attached to the Witter Decl.), which establish
11  a process for review of the denial a park use application to the
12  City Manager.  Therefore, it appears there is a process for
13  appealing the denial of an application for permit to extend time
14  in the City parks and there is no evidence that judicial review
15  is unavailable.

16      In addition, as of the date Plaintiffs filed this action,
17  they had not actually applied for a park use permit, so their
18  claims that the Director has unfettered discretion to deny
19  applications for permits remains untested.  What the Director's
20  decision will be on the application that Plaintiffs submitted on
21  November 3 is unknowable.  Therefore, the Court again finds that
22  Plaintiffs' have not met their burden to establish a likelihood
23  of success on the merits.

24      Fifth, Plaintiffs' have failed to demonstrate that they are
25  likely to be able to show that § 12.72.090 is unconstitutional
26  because the City exempts itself from its own permitting
27  requirements and could potentially engage in viewpoint
28  discrimination by favoring one form of speech over another.

1  However, Plaintiffs provide no evidence to support the conclusion

2  that the City has or is likely to engage in such viewpoint

3  discrimination and, in any event, the Supreme Court has upheld

4  instances where the government has favored one viewpoint over

5  another.  See Pleasant Grove v. Summum, 555 U.S. 460 (2009); Rust

6  v. Sullivan, 500 U.S. 173 (1991).  Plaintiffs have not

7  demonstrated that any hypothetical action by the City favoring

8  one viewpoint over another would necessarily be unconstitutional.

9       In sum, Plaintiffs have failed to demonstrate that they are

10  likely to succeed on the merits on their claims.  Winter,

11  555 U.S. at 20.  Under an intermediate level of review, it

12  appears substantially likely that § 12.72.090 is a

13  constitutionally sound, narrowly-tailored time, place or manner

14  restriction.  See Nordyke, 644 F.3d 792-93.  Because Plaintiffs

15  cannot show success on the merits, and must show each of the

16  requisite elements to obtain a TRO under the Winter standard,

17  their Motion fails.  Winter, 555 U.S. at 20.

18       The Court will briefly discuss each of the remaining

19  elements for obtaining a TRO but concludes that under the sliding

20  scale standard, Plaintiffs have failed to establish entitlement

21  to a TRO because they have not demonstrated a likelihood of

22  irreparable harm or shown that an injunction is in the public

23  interest.  Cottrell, 632 F.3d at 1131-36.

24  ///

25  ///

26  ///

27  ///

28  ///

### 2.   Irreparable Harm


Because Plaintiffs have failed to establish that they are likely to succeed on the merits of demonstrating that § 12.72.090 is unconstitutional, they cannot show they will suffer irreparable injury from the continued application and enforcement of the ordinance.   In addition, as discussed earlier, Plaintiffs' twenty-five day delay in bringing this action, after their TRO was denied by Judge Connelly, significantly undermines their assertion that they will suffer irreparable injury from the continued enforcement of § 12.72.090 absent a TRO.   They could have sought an injunction, but failed to do so.


### 3.   Balance of the Equities and Public Interest


Because Plaintiffs have not met their burden to demonstrate that they are likely to succeed on their argument that § 12.72.090 is unconstitutional, they cannot show that the balance of equities or public interest favor the granting of a TRO to suspend the enforcement of a presumptively constitutional statute.   Furthermore, on balance Plaintiffs have not met their burden of showing that whatever expressive benefit Plaintiffs may derive from instituting around-the-clock activities in the Park is outweighed by the public interest in the various benefits derived from the hours restrictions established by § 12.72.090.

///

///

///

23

1
2

**CONCLUSION**

3       For the reasons set forth in this Order, the Court concludes
4   that Plaintiffs have not met their burden of showing that they
5   are entitled to the extraordinary remedy of a TRO under the
6   standards articulated in <u>Winter</u> and <u>Cottrell</u>.  Plaintiffs' Motion
7   for a Temporary Restraining Order is therefore DENIED.
8       IT IS SO ORDERED.

9   Dated: November 4, 2011
10
11
12      MORRISON C. ENGLAND, JR.
        UNITED STATES DISTRICT JUDGE
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

24